IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CLEVON HARMANSON | § | |
| | § | C.A. No. 1:15-cv-179 |
| VS. | § | |
| | § | JUDGE RON CLARK |
| PHILLIP M. RYAN AND CON-WAY | § | |
| TRUCKLOAD, INC. | § | BRC |

**PLAINTIFF'S OPPOSED MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE RON CLARK:

COMES NOW Plaintiff Clevon Harmanson, ("Mr. Harmanson"), and files this Plaintiff's Opposed Motion for Partial Summary Judgment pursuant to Fed. R. Civ. P. 56(a), ("MPSJ"), moving this Court to grant summary judgment in his favor pertaining to the affirmative defenses of "accord and satisfaction" and "waiver and acquiescence" asserted in the Answers of Defendants Phillip M. Ryan and Con-way Truckload, Inc., ("Ryan," "Con-way," collectively "Defendants"), on-file herein, and preserved in their Stipulation of Liability also on-file; and, in support thereof provides the following information, analysis, argument and authorities:

**I.**
**BRIEF SUMMARY OF MOTION**

1.     This diversity case, removed from state court, involves Texas state law-based negligence claims asserted by Mr. Harmanson against each of the Defendants[1] for purposes of recovering compensatory damages arising from a collision between Mr.

---

[1]  See *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938); and, *All Plaintiffs v. All Defendants,* 645 F.3d 329, 335 (5th Cir. 2011) *disapproved of* [on unrelated grounds] *by Highland Homes Ltd. v. State,* 448 S.W.3d 403 (Tex. 2013)("The black letter rule of *Erie* is that federal courts 'apply state substantive law and federal procedural law.' *Foradori v. Harris,* 523 F.3d 477, 486 (5th Cir.2008).").

Harmanson's vehicle and a vehicle owned by Con-way and operated by Ryan, that occurred on September 19, 2014. In the Answer and Affirmative Defenses of Ryan and in the First Amended Answer and Affirmative Defenses of Con-way, each Defendant has identically asserted the Texas state law-based affirmative defenses of "accord and satisfaction" and "waiver and acquiescence," (among other affirmative defenses). Additionally, while said Defendants have filed a Stipulation of Liability, such Stipulation expressly preserves the intention of Defendants to "advance their affirmative defenses of waiver, acquiescence, accord and satisfaction." In order to resolve all liability issues and thereby to significantly shorten the trial of this case on its merits, and pursuant to Fed. R. Civ. P. 56(a), Mr. Harmanson seeks a partial summary judgment in his favor pertaining to the stated affirmative defenses upon which Defendants bear the burden of proof. As will be herein explained in detail, none of the preserved affirmative defenses have any basis in fact whatsoever and consequently may not be properly asserted as a matter of law. Therefore, Mr. Harmanson is entitled to a partial summary judgment in his favor regarding each and all of the stated preserved affirmative defenses, as against each and both of said Defendants, as a matter of law.

## II.
## MPSJ EVIDENCE

2.      In support of his instant MPSJ, Mr. Harmanson has marked for identification and attaches hereto each of the following Exhibits, ("Motion Ex. __"), each and all of which

are hereby adopted and incorporated herein and made a part hereof as if set out in full,

pursuant to Fed. R. Civ. P. 10(c):[2]

> 1) Motion Ex. "A," – Copy of Defendants' Stipulation of Liability, executed by counsel of record for all Parties herein and filed with the Clerk of Court on December 7, 2015, (Doc. 29);[3]
>
> 2) Motion Ex. "B," - Copy of relevant portions of the transcript of the discovery deposition of Plaintiff Clevon Harmanson obtained during discovery herein, dated January 15, 2016;[4]
>
> 3) Motion Ex. "C," – Sworn Affidavit of Plaintiff Clevon Harmanson, dated March 4, 2016;
>
> 4) Motion Ex. "D," – Copy of relevant portions of the transcript of the

---

[2] *See Carroll v. Fort James Corp.,* 470 F.3d 1171, 1176 (5th Cir. 2006)("[I]ncorporation must be done 'with a degree of specificity and clarity which would enable the responding party to easily determine the nature and extent of the incorporation.' *Wolfe v. Charter Forest Behavioral Health Sys., Inc.,* 185 F.R.D. 225, 228–29 (W.D.La.1999); *see also* 5 Charles Allan Wright & Arthur R. Miller, Fed. Practice and Procedure: Civil 2d § 1326 ('[R]eferences to prior allegations must be direct and explicit in order to enable the responding party to ascertain the nature and extent of the incorporation.'); *Kolling v. Am. Power Conversion Corp.,* 347 F.3d 11, 17 (1st Cir.2003) (same); *Heintz & Co. v. Provident Tradesmens Bank & Trust Co.,* 29 F.R.D. 144 (E.D.Pa.1961) (same).").

[3] Mr. Harmanson acknowledges that in *Munoz v. Int'l All. of Theatrical Stage Emp. & Moving Picture Mach. Operators of U. S. & Canada,* 563 F.2d 205, 207, n. 1 (5th Cir. 1977), the 5th Circuit made clear that: "Federal Rule of Civil Procedure 56 contemplates an orderly scheme within which to determine whether summary judgment is proper. See generally Wright and Miller, Federal Practice and Procedure: Civil ss 2711-2742. In the most part, admissibility of evidence on a motion for summary judgment is subject to the general rules relating to form and admissibility at trial. *Roucher v. Traders & Gen. Ins. Co.,* 235 F.2d 423, 424 (5th Cir. 1956). See also *United States v. United States Gypsum Co.,* 340 U.S. 76 (1950); *Olympic Ins. Co. v. H. D. Harrison, Inc.,* 418 F.2d 669, 670 (5th Cir. 1969)." *Id.,* at 207, n. 1. However, the Circuit there also explained that: "In disposing of motions for summary judgment the trial court may consider ***pleadings***, affidavits, depositions, motions, answers to interrogatories, ***stipulations*** and any other material properly before it. (Emphasis added)." *Id.* Moreover, the Circuit stated: "Materials not presented to the district court for consideration of a motion for summary judgment are never properly before the reviewing court on appeal from the judgment granting the motion. *Auto Drive-Away Co. v. ICC,* 360 F.2d 446 (5th Cir. 1966); *Marion County Cooperative Ass'n v. Carnation Co.,* 214 F.2d 557 (8th Cir. 1954). See *Smith v. Olin Chemical Corp.,* 555 F.2d 1283 (5th Cir. 1977)." *Id.,* at 209. Consequently, for completeness of the Court's instant analysis, ease of reference and FRCP 56 compliance, the Stipulation is attached as a Motion Ex.

[4]

In the MPSJ Factual Summary *infra,* citations to deposition transcripts will be by page(s) and line(s), *i.e.* (5:3-4).

discovery deposition of fact witness Jaquail Miller obtained during discovery herein, dated February 10, 2016;

5)   Motion Ex. "E," – Copy of relevant portions of the transcript of the discovery deposition of Defendant Con-way Truckload Inc.'s employee, (and designated Fed. R. Civ. P. 30(b)(6) corporate representative), Summer Hambright obtained during discovery herein, dated February 11, 2016;

6)   Motion Ex. "F," – Copy of relevant portions of the transcript of the discovery deposition of Defendant Phillip M. Ryan obtained during discovery herein, dated February 15, 2016;

7)   Motion Ex. "G," – Copy of internal Accident Report of Defendant Con-way and internal log of communications with Mr. Harmanson post-incident, dated September 19, 2014, through November 18, 2014, (Ex. 3 to deposition of Con-way employee Hambright);

8)   Motion Ex. "H," – Copy of relevant portions of Defendant Ryan's Responses Nos. 2 and 6 to Plaintiffs' First Set of Interrogatories provided during discovery herein, dated November 2, 2015;

9)   Motion Ex. "I," – Copy of undated and unsigned "Full and Absolute Property Damage Release" prepared by Defendant Con-way and transmitted to Mr. Harmanson at the time his property claim was being settled, (Ex. 5 to deposition of Con-way employee Hambright);

10)   Motion Ex. "J," – Copy of front and back of property claim settlement funds check no. 642858, from Con-way to Mr. Harmanson, dated October 17, 2014, in the amount of $1,544.74, on the reverse side of which appears an endorsement space statement of release of "all claims" in small, unhighlighted text, (Ex. 6 to deposition of Con-way employee Hambright);

11)   Motion Ex. "K," – Copy of front face of Con-way check no. 642858, together with check stub dated October 10, 2014, obtained during discovery herein;

12)   Motion Ex. "L," – Copy of email from Con-way's employee Hambright to Mr. Harmanson, dated September 26, 2014, confirming said company's intention to "move forward with your Property Damage Claim," (Ex. 7 to deposition of Con-way employee Hambright);

13)     Motion Ex. "M," – Copy of relevant portions of settlement adjustment records of Crawford and Company, independent adjuster for Defendant Con-way re Mr. Harmanson's vehicle damage claim produced by said Defendant during discovery herein and Bates-stamped as Con-way 000001-5, 000009, 000016-19 and 000080-81; and,

14)     Motion Ex. "N," – Copy of Defendant Con-way's Responses and Objections tendered on February 17, 2016, Nos. 1-16, regarding Plaintiff's Request for Admissions to Defendant, produced during discovery herein.

## III.
## MPSJ FACTUAL SUMMARY

3.      Pursuant to the requirements of Fed. R. Civ. P. 56(a) and (c)(1), Mr. Harmanson provides the following material facts, citing to the source thereof as contained in the above-listed Motion Exhibits. The Court should note that based upon all discovery undertaken in this case to date, Defendants do not and *cannot* contest the validity of any of the following facts.[5] Mr. Harmanson's discovery deposition was taken on January 15, 2016, (Motion Ex. B). In relevant part he testified[6] that he was born in August, 1984 (*Id*. at 7:17-18), and is currently thirty-one years old. He is not married and has no

---

[5] *See Anderson v. Liberty Lobby, Inc., 477* U.S. 242, 248 (1986)("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93–95 (1983)."); and, *United States v. Marshall,* 771 F.3d 854, 862 (5th Cir. 2014)("Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a). 'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).").

[6] As the deposition of Mr. Harmanson was taken by defense counsel for discovery purposes only, his undersigned counsel of record did not ask any questions. Therefore, to the extent that Mr. Harmanson's sworn testimony is incomplete on the matters addressed by the instant MPSJ, additional information is provided by affidavit, Motion Ex. C. See Fed. R. Civ. P. 56(c)(4). *See also Jackson v. Cal-W. Packaging Corp.,* 602 F.3d 374, 377 (5th Cir. 2010)(" 'Sworn affidavits ... are certainly appropriate for review on a Rule 56 motion for summary judgment.'[2] [citing *E.E.O.C. v. WC&M Enters., Inc.,* 496 F.3d 393, 398 (5th Cir.2007)]."); and, *Morrison Flying Serv. v. Deming Nat. Bank,* 340 F.2d 430, 433 (10th Cir. 1965)("In determining whether to grant the motion, the court must consider the case as a whole, including the allegations of the complaint as well as the affidavits and other evidence before it.").

children (*Id.* at 8:22-25).  He is a high school graduate (*Id.* at 12:7), and has attended college at Lamar University, (*Id.* at 13:2-7), for two and a half years, (*Id.* at 13:10-11). Regarding the collision made the basis of this suit, Mr. Harmanson was stopped at a stop sign on his way home and a Con-way truck in front of him suddenly went into reverse and backed into him, (*Id.* at 25:25-26:4, 26:13-14). The Con-way truck was an 18-wheeler, (*Id.* at 29:25). After the collision, he and the truck's driver talked, looked at their vehicles and exchanged information, (*Id.* at 35:9-13). He obtained Defendant Ryan's name, insurance information, Truck number "and everything," (*Id.* at 35:16-25). Later that same day, he called Con-way to discuss the incident, (*Id.* at 36:3-4). Also, at the scene, he and Ryan talked about "more or less on how we are going to get everything settled with the car, and if anybody have [sic] injuries," (*Id.* at 36:17-19), because he had a passenger, Jaquail Miller, (*Id.* at 36:19-20, 22). He and Miller are cousins, (*Id.* at 37:17). Ryan inspected the damage to Mr. Harmanson's car, (*Id.* at 37:22-23). They did not reach any agreement regarding the extent of damage, (*Id.* at 37:24-38:1), and they did not reach any agreement on a "financial settlement," (*Id.* at 38: 2-4). They talked about the car and injuries, "that's it, (*Id.* at 38:6-7). Ryan told him he was "in the wrong" about the collision and that he was lost, and Mr. Harmanson told him how to get to his destination, (*Id.* at 38:6-11). On Mr. Harmanson's car, the "whole front bumper was hanging", the grill and hood were "mashed in" from being hit by the 18-wheeler, (*Id.* at 38:22-25).

4.     Specifically regarding the instant analysis, Mr. Harmanson stated that he and Ryan did not reach any "financial settlement" or an agreement for $400. In fact, Ryan gave Miller $400, not Mr. Harmanson, (*Id.* at 39:1-10). Miller told him later that Ryan

told Miller that the $400 was payment for him "not to say nothing." Mr. Harmanson and Ryan did not exchange any money or have any financial transaction. (*Id.* at 39:11-17). Mr. Harmanson doesn't know how Miller and Ryan arrived at the figure $400, as he heard no part of their conversation, (*Id*. at 39:18-40:4). However, Ryan told him about it, (*Id.* at 40:5-9). Ryan offered Mr. Harmanson the same "deal," but he declined. Then, Ryan told him "he was going to take care of everything," but again Mr. Harmanson told him "no," and insisted that the company's insurance was going to take care of the matter, (*Id.* at 41:23-42:5). Later, the company "resolved the issues with respect to the – to the damages to the vehicle," "with a check for about… $1,500," (*Id.* at 120:1-4). "***That paid for the repairs to his vehicle***. (Emphasis added)." (*Id.* at 120: 5-6).

5.     In brief supplement to the foregoing testimony, in his attached affidavit, (Motion Ex. C), Mr. Harmanson avers under oath that: he was never advised by Con-way, or Hambright specifically, that the settlement check sent to him was intended to be a complete settlement of all of his claims; he accepted the settlement as resolution only of his vehicle property damage claim; he has received extensive medical care for injuries received from the collision and it is ridiculous to even suggest that "1,544.74, the exact amount Con-way's retained adjuster, Crawford & Co., arrived at for the damage to his vehicle, would also fairly and adequately compensate him for his bodily injuries; and, the money received from Con-way was used to repair his damaged vehicle. *Id.*

6.     Mr. Jaquail Miller's discovery deposition was obtained on February 10, 2016, (Motion Ex. D). In relevant part, he testified that he and Mr. Harmanson are cousins, (*Id.* at 5:4-5). The familial connection is more remote than that, but they are "really

related," (*Id.* at 5:12), and they "refer to each other as cousins," (*Id.* at 5:17-19). He is twenty-five years old, (*Id.* at 11:1). On September 19, 2014, he and Mr. Harmanson went to look for jobs, (*Id.* at 14:21-22). However, the collision stopped that trip, (*Id.* at 15:16-19). At the intersection of 7th Street and 9th Avenue, he and Mr. Harmanson were stopped at a stop sign behind a Con-way 18-wheeler, (*Id.* at 16:17-24; 17:8-10). While they were sitting still, the 18-wheeler went into reverse and started backing up, (*Id.* at 17:13-14). Mr. Harmanson started blowing his horn but they couldn't move out of the way because there were cars behind them, (*Id.* at 17:14-16), and the truck hit their vehicle "kind of hard," (*Id.* at 17:17-18). After the collision, they and the truck's driver all got out of their vehicles, (*Id.* at 18:16-18). At first the truck's driver didn't seem to know he had hit their vehicle, (*Id.* at 18:16-17), but when he got out of the truck and looked, he said, "Oh man, I didn't know, I didn't see you," (*Id.* at 18:22). He said he was from Tennessee and he was lost, (*Id.* at 18:25-19:2). Then, the driver, [Defendant Ryan], said, "Man, please, please don't call the law and I'll pay you… because he had – he said he just got in an accident not too long before that…" (*Id.* at 19:4-7; 20:19-20; 27:11-12). He offered for them to follow him to an ATM so he could pay them, but Mr. Harmanson told him, "I want your insurance… I'm not going to take your money," (*Id.* at 19:16-20). Mr. Harmanson also told him Miller had been in his car and wanted to go to the hospital, so the driver said, "Man, I'll pay your cousin," (*Id.* at 19:20-22). So Miller took the $400 from the driver, which was obtained at a store in the area, (*Id.* at 22-24). But, Mr. Harmanson refused to take any money, (*Id.* at 19:24-20:2).

7.      The driver said to Miller that, "I'll pay you not to go to the hospital… I'll pay you not to call the law," (30:11-12). He also said he didn't want them to file on his insurance

and he'd pay him for that, (*Id.* at 30:16-18). So, Miller asked him how much he would pay, and the driver said they could go to an ATM and they did so and the driver paid Miller $400. (*Id.* at 30:18-20). The driver offered Mr. Harmanson $1,000, but he refused to take it, (*Id.* at 31:23-32:4). Mr. Harmanson told him that he instead intended to file a claim on the driver's insurance because $1,000 wasn't going to cover the damage to his vehicle, (*Id.* at 32:6-8;). The driver offered Mr. Harmanson money several times, but each time he refused it, (*Id.* at 32:15-17). Even when the driver handed him his $400 by the ATM, Mr. Harmanson again refused to take the $1,000 he offered, (*Id.* at 34:3-9). The driver told them at the collision scene that he had two insurances - one personal and the other company, and because of his recent prior wreck he asked that any claim be filed on his personal insurance, (*Id.* at 39:18-25; 40:14-22). The driver was also worried about being fired, (*Id.* at 39:25-40:1), and he didn't want the company to know, (*Id.* at 40:8-13). Nevertheless, Mr. Harmanson took his company insurance information, (*Id.* at 40:3-4).

8.      In his relevant Responses to Plaintiff's First Set of Interrogatories, (Motion Ex. H), Defendant Ryan asserted that: "Subsequent to the incident, Mr. Harmanson… requested that I give him $400, so I went to the ATM machine and withdrew the money from my bank account. Mr. Harmanson accepted this money as settlement for any claims he had regarding the incident. He called me a few times after the incident and told me he was going to Con-way to get more money but he did not tell me he was going to file this lawsuit. My impression was that it was taken care of." (*Id.*, Response No. 2). Additionally, Ryan asserted: "I paid and the Plaintiff accepted money at the time of the accident in settlement of any and all claims which would arise as a result of the

occurrence. He called me a few times after the incident and told me he was going to Con-way to get more money but he did not tell me he was going to file this lawsuit. My impression was that it was taken care of." (*Id.*, Response No. 6). Respectfully, even if these Responses were the only information available, they make no logical sense. If an alleged payment of $400 was to settle all claims, why would Mr. Harmanson communicate further with Ryan, or contact the company or file suit? Moreover, this is *not* the only information available from Ryan, as his discovery deposition was taken on February 15, 2016, (Motion Ex. F). And, as the Court should readily note from the following summary thereof, Ryan's sworn testimony starkly, directly contradicts his Interrogatory Responses Nos. 2 and 6.

9.     In relevant part Ryan testified that he graduated high school, (*Id.* at 15:10-12), and has "two and a half years of college," (*Id.* at 15:22). He has a CDL, (*Id.* at 10-12), and had it on the date of the collision, (*Id.* at 23:21-24). On his employment application with Con-way, Ryan admitted to a prior collision while working for Stephens Transport during the period of February-August, 2013, (*Id.* at 29:12-16), although he no longer "remember[s] the accident," (*Id.* at 23:24; 28:13). He also received a citation for an illegal lane change in North Carolina during the period of April 23-May 23, 2013, for which he paid a fine, (*Id.* at 32:22-33:7). He applied for work at Con-way on July 3, 2014, (*Id.* at 33:9-16), and his collision with Mr. Harmanson occurred on September 19, 2014, (*Id.* at 42:12-15), or about two and a half months later. The tractor part of his truck was the one he normally drove, (*Id.* at 46:20-47:5).  The trailers were different all the time, (*Id.* at 47:10-12). The one he was moving at the time was loaded, (*Id.* at 48:6-8). He was delivering it to Chevron's plant, (*Id.* at 48:19-22; 49:25), in Port Arthur, (*Id.*

at 49:25-50:1). The collision occurred in Port Arthur, (*Id.* at 51:8-11). The trailer was a 53 footer box trailer, (*Id.* at 53:4-7). That's a normal length, for "18-wheelers," (*Id.* at 53:19-22). He hadn't been to the Chevron plant before, (*Id.* at 63:10-12).

10.   The collision occurred between 1:00-4:00 pm, in "definitely daytime," (*Id.* at 63:13-18). He was alone in his truck with no passengers or pets aboard, (*Id.* at 63:21-64:4). He had a "Qualcomm" GPS device on his truck, (*Id.* at 64:5-8), but he was lost, (64:18-20). The "GPS wasn't taking him the right way," (*Id.* at 65:2-3). He "was looking for the Chevron and got mixed up and ended on the wrong end of the street," (*Id.* at 65:5-7). The collision happened on the "same street or close to it," (*Id.* at 65:13-16). He was at a stop sign, (*Id.* at 65:20). The street was level and flat, (*Id.* at 66:3-7). While at the stop sign, he realized he was lost, (*Id.* at 66:13-14). His intention was to get out and ask for directions, (*Id.* at 66:14-16), but he was stopped in the roadway, (*Id.* at 66:17-19). He was not on the shoulder or in a parking lot, but on the "road itself," (*Id.* at 66:24-67:11). So, he decided to "back up to get closer to the curve and I'd park my truck, turn it off and go and, you know, ask for help." (*Id.* at 67:14-17). However, he was not able to do that because the collision happened, (*Id.* at 69:10-15). At the time of the collision, he was in reverse gear, (*Id.* at 69:16-18). He was not just rolling backwards, he had the truck in gear, (*Id.* at 69:20-23; 70:10-11). He agreed he was moving backwards at the time of the collision, (*Id.* at 71:12-14). He claimed that he didn't see the vehicle behind him because it was in his blind spot, (*Id.* at 71:22), but when he "felt a little, small nudge," he stopped and parked the truck, (*Id.* at 71:23-25). He conceded that he felt the impact and knew he had hit something, and he knew he had hit a car, (*Id.* at 72:23-

73:3). After he felt it, he came to a stop, (*Id.* at 74:6-9). He pulled forward and set the brake, (*Id.* at 74:13-14).

11.     Ryan exited his truck and walked back to the car behind him, where he saw "Mr. Clevon and his cousin" and they "started talking," (*Id.* at 74:23-75:2). He clarified that he meant Mr. Harmanson and his cousin, Mr. "Jequel" Miller, (*Id.* at 75:3-12). Ryan asserted that he looked at the damage and it "wasn't that serious or bad, they didn't say anything about pain… so… we ended up talking and he was telling me that, you know, you know, obviously I just hit him," (*Id.* at 75:18-25), "so he told me that the car had some damage and stuff. And I was telling them that maybe we could work something out. You know, small damage and try to. You know, take care of it from that angle," (*Id.* at 76:2-7). Then, Mr. Harmanson took his information, insurance and phone number and they both took pictures of the damage, (*Id.* at 76:12-18). Ryan claimed that "we came up with an agreement as far as money, you know, as far as payment, as far as taking care of the damages," (*Id.* at 78:11-12). "It wasn't nothing about his cousin having neck injuries or, you know, more money or this and that," (*Id.* at 78:17-19). They agreed not to call the police, (*Id.* at 80:2-4). However, critically important to the instant analysis, Ryan contended that he and Mr. Harmanson agreed on "[a] price to take care of the damage to his car," "a price to take care of the property damage," "that's it," "[n]o bodily injury, nothing like that," "a price to take care of only property damage," "[j]ust the car, property damage," (*Id.* at 80:17-81:13). Thus, even if an agreement had been struck, it was on its face limited to property damage. Therefore, what possible basis could such an agreement be to support the affirmative defenses of "accord and satisfaction" and "waiver and acquiescence" asserted by Con-way herein? Moreover,

if such an agreement took place, why did Mr. Harmanson bother to obtain insurance and contact information and take photos of his own vehicle? And, why would Mr. Harmanson subsequently retain counsel, assert a claim against Con-way and file suit? At worst, Ryan is simply making the facts up as he goes along because he was trying to hide the collision from his new employer.  Or at best, even if his version can be believed (which taxes the imagination), because he had no authority whatsoever to negotiate a settlement of anything, such agreement had no validity; and even if it did, it was limited to property damage! Moreover, the finality of any such agreement is undercut by Ryan's own testimony that he gave Mr. Harmanson $400, (*Id.* at 82:2-3), but if he needed more later, he should call him and let him know, (*Id.* at 82:13-14). Consequently, the Court should readily observe that such testimony is diametrically opposite the discovery answers Ryan provided, as summarized *supra*.

12.    Ryan claimed he had little conversation with Miller, (*Id.* at 83:20-84:3; 85:13-17, 85:22-23). However, he conceded that he told Mr. Harmanson he didn't want "an accidents (*sic*) on [his] report," for his employer, (*Id.* at 87:5-7). After the collision, he followed Mr. Harmanson's car in his Con-way truck to a nearby gas station, where he gave "him" $400. (*Id.* at 91:3-9). However, Ryan reiterated that the $400 was to "pay for the damages," "the property damage," (*Id.* at 93:10-17).  He also reiterated that he told Mr. Harmanson that "if that wasn't enough, you know we can talk about it," (*Id.* at 94:5-8). He also claimed that when they went for the money, Mr. Harmanson claimed damages of "between $400 and $800," so "I told him that's what I gave him [$400] to start it off," (*Id.* at 95:2-3). There was no paperwork, (*Id.* at 95:4-5). Ryan further stated: "I felt like that $400 should pretty much take care of everything. And, I did tell him, you

know, if, you know, if he was to get, you know, solid estimate and basically just to let me know… I'll pay him." (*Id.* at 97:1-7). Indeed, after the day of the collision, they talked by phone "a few times" and Mr. Harmanson told him about the problems with his car, (*Id.* at 102:3-5; 102:12-19).

13.     Respectfully, the Court should recall that Ryan stated in his discovery responses that Mr. Harmanson "settled any and all claims which would arise as a result of the occurrence;" yet even these snippets of Ryan's testimony flatly negate that allegation. Moreover, it is mystifying as to how Con-way could suggest any sort of binding settlement arising from this alleged transaction as Ryan was fired, (*Id.* at 104:21-25), for both "unsafe driving behavior which resulted in a preventable crash," (*Id.* at 106:22-25) and attempting to conceal the collision and his attempt to settle claims arising from it under the table, (*Id.* at 113:8-114:19). Company policy required him to report an accident, which he failed to do, and then he "attempted to hide that from Con-way," (*Id.* at 115:12-14; 116:13-24). Additionally, company policy prohibited making settlements, (*Id.* at 117:1-17). In sum, Ryan's illicit actions are best summed up by his own testimony: "I wasn't hiding it [the collision and the putative settlement] from them [Con-way], but I didn't tell them." (*Id.* at 118:25-119:1).

14.     During the course of discovery herein, Plaintiff also propounded a Request for Admissions, including eighteen (18) admission requests. Con-way tendered its Responses and Objections thereto on February 17, 2016, (Motion Ex. N). In its sequential Responses, Conway admits that: (1) Con-way's check made payable to Clevon Harmanson, in the amount of $1,544.74, (Motion Ex. J) is a true and correct copy; (2) the Estimate of Record, (Con-way 000001-05, as contained in Motion Ex. M),

accurately summarizes the damage to Mr. Harmanson's vehicle; (3)  Crawford & Co. was paid to prepare the Estimate of Record; (4) Crawford & Co. prepared the Estimate of Record for Con-Way's use; (5) the total cost of repairs to Mr. Harmanson's vehicle was, (as reflected in the Estimate of Record), $1,544.74; (6) the Estimate of Record was completed on October 10, 2014; and, (7) the cost of repairs - $1,544.74 - is exactly the same amount as reflected by the check issued to Mr. Harmanson. (Motion Ex. N, at nos. stated). Con-way further admitted that: (8) Ms. Summer Hambright was an employee of Con-way in October, 2014; (9) part of Hambright's responsibilities with Con-way included "handling Plaintiff's... vehicle property damage claim arising from the occurrence in question"; (10) Hambright received Crawford & Co.'s Estimate of Record as an appraisal of such damage; and (11) Crawford & Co.'s supplement, dated October 22, 2014, (Con-way 000080-81), is a true and correct copy. (*Id.*).

15.     Importantly, Con-way further responded to Plaintiff's Request for Admissions as follows. Con-way ***denied*** that: (12) Hambright offered Mr. Harmanson "$1,544.74, inclusive of rental per our appraisal, (see Con-way 000080); (13) "per our appraisal" references Crawford & Co.'s Estimate of Record; (14) Hambright's offer of $1,544.74 was to resolve Mr. Harmanson's property (vehicle) damage claim only; (15) Hambright's offer of $1,544.74 was not intended to resolve Mr. Harmanson's bodily injury claim; (16) the check issued by Con-way to Mr. Harmanson was intended to settle his property damage claim only; and (17) said check was not intended to settle Mr. Harmanson's bodily injury claim. Those denials are remarkable considering that in Con-way's internal

records regarding communications with Mr. Harmanson post-collision, (Motion Ex. G),[7] on September 24, 2014, Mr. Harmanson was noted to be "claiming injuries," in addition to making a claim for property damage, (entry of 9/25/14). Con-way felt that "It appears Clmt is trying to run up repairs on this car… watch for fraud…" (entry of 9/25/14). Yet, in the entry dated 9/26/14, Mr. Harmanson confirmed to Con-way that their driver (Ryan) "paid off passenger Jaquail Miller to 'keep his mouth shut'"; and, on 9/29/14, the entry confirms that the driver did make such an offer and that the driver would be brought back to the company's offices "for further review of this accident and procedures regarding 'paying off drivers/passengers to not report accidents to the company," (*Id.*). Therefore, respectfully, the legitimate question arises as to who was attempting to defraud whom? On 9/29/14, Con-way hired Crawford & Co. because "clmt is… playing a scam," (*Id.*); yet, Crawford & Co. confirmed damage to Mr. Harmanson's vehicle in the amount of $1,544.74, per entry of 10/13/14. Then, on October 14, 2014, appears, in relevant part, this entry: "… explained my final offer on PD [**PROPERTY DAMAGE**] would be the $1,544.74 he could get w/ his shop and see if they would fix for that /clmt stated that he agrees to PD [**PROPERTY DAMAGE**] settlement of $1,544.74, wants check made out to him, I told him I would be preparing a PD [**PROPERTY DAMAGE**] release and will email it to him for him and his Atty to look at, will need that signed and we will move forward w/ processing check/emailed release for PD [**PROPERTY DAMAGE**] in amount of $1,544.74 to [ends here](Emphasis added)."

---

[7] As discussed *infra,* all of the log entries were made By Con-way's employee Ms. Summer Hambright. She also prepared all documentation relevant to the case, on behalf of Con-way.

Motion Ex. I is the "Full and Absolute Property Damage Release." In the first place, the document was never executed by Mr. Harmanson and thus is an unenforceable contract; particularly, because the purported release prepared by Con-way required the releasor's signature. *See Lujan v. Alorica,* 445 S.W.3d 443, 448 (Tex.App.- El Paso 2014, no pet.)("Relevant to our determination of whether a binding contract exists is the presence or absence of signatures on a written contract. *In re Bunzl USA, Inc.,* 155 S.W.3d 202, 209 (Tex.App.-El Paso 2004, orig. proceeding). Parties to a contract may direct that a signature of each party is a prerequisite to the formation of a binding written contract. *Id. at citing* 1 Arthur Linton Corbin, Corbin on Contracts § 2.10 at 165 (Joseph M. Perillo rev. 1993)").  Second, the purported Release, even if it had been executed, from its very title and throughout its text repeatedly refers to settlement of property damage claims only. Therefore, to bootstrap an unsigned, clearly limited release into a binding, global one is manifestly insupportable. Moreover, the entries in Con-way's communications log with Mr. Harmanson, (Motion Ex. G), from October 15, 2014, forward are suffused with discussions of the breakdown of the parties' agreement to settle the property damage claim, the limiting of discussion to such property damage claim and the fact that Hambright and Mr. Harmanson were discussing only the resolution of his property damage claim, because he was represented by counsel regarding his personal injury claim and the attorney was not involved in the property damage claim. Indeed, on September 26, 2014, Hambright emailed Mr. Harmanson specifically expressing her desire to "move forward with your Property Damage Claim, (*Id.*).  But in the entry of April 13, 2015, Con-way directly confirms that it has asked its lawyer to try to convert the signed check into a general release. Now, that might seem, at worst, a mere statement of position or a good

faith disagreement as to release terms. However, such arguments of validity or good faith evaporate when one considers the actual sworn testimony of Hambright, obtained subsequently.

16.    The discovery deposition of Con-way's employee, (and Fed. R. Civ. P. 30(b)(6) designated corporate representative),[8] Summer Hambright was taken on February 11, 2016, (Motion Ex. E). In relevant part, Hambright stated that her employer is "XPO

_____

[8] (Motion Ex. E, 4:19-21). As this Court knows, pursuant to Rule 30(b)(6), a designated corporate representative "must testify about information known or reasonably available to the [Defendant]." *Id. See also Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 433 (5th Cir. 2006)("[T]he deponent ' "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the party noticing the deposition] and to *prepare* those persons in order that they can answer fully, completely, unevasively, the questions posed ... as to the relevant subject matters." ' (footnote citation omitted).").Moreover, "The corporation appears vicariously through the person testifying on its behalf. *Resolution T. Corp. v. S. Union Co.,* 985 F.2d 196, 197 (5th Cir.1993). The deponent has a duty to make a good-faith effort to designate a knowledgeable representative and to prepare the representative so he can fully, completely, and unevasively answer questions about all of the noticed topics. *Brazos River Auth. v. GE Ionics, Inc.,* 469 F.3d 416, 433 (5th Cir.2006); *Mike Hooks Dredging Co., Inc. v. Eckstein Marine Serv., Inc.,* No. 08–3945, 2011 WL 2559821, at *2 (E.D. La. June 28, 2011) (Berrigan, J.)." *Omega Hosp., LLC v. Cmty. Ins. Co.,* 310 F.R.D. 319, 321-22 (E.D. La. 2015). Consequently, in addition to being provided under oath, the Court may rely upon the testimony of said witness as being complete and reliable. *See Nevada Power Co. v. Monsanto Co.,* 891 F. Supp. 1406, 1418 (D. Nev. 1995)("In producing representatives for a Rule 30(b)(6) deposition, a corporation must prepare them to give 'complete, knowledgeable and binding answers.' *Marker v. Union Fidelity Life Ins. Co.,* 125 F.R.D. 121, 126 (M.D.N.C.1989)."); *see also Coal. for a Sustainable Delta v. John McCamman,* 725 F. Supp. 2d 1162, 1172, n. 10 (E.D. Cal. 2010)("*E.g., Mitchell Eng'g v. City & County of San Francisco,* 2010 WL 455290, at *1, 2010 U.S. Dist. LEXIS 20782, at *4 (N.D. Cal. Feb. 2, 2010) ('A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity.') (quotation marks and citation omitted); *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co., Inc.,* 251 F.R.D. 534, 538 (D.Nev.2008) (same); *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.,* 250 F.R.D. 203, 212 (E.D.Pa.2008) ('the purpose behind Rule 30(b)(6) is to create testimony that will bind the [agency]' (quotation marks and citations omitted)); *Booker v. Mass. Dep't of Pub. Health,* 246 F.R.D. 387, 389 (D.Mass.2007) ('the [agency] is obligated to prepare the designees so that they can give knowledgeable and binding answers' (quotation marks and citations omitted)); *Kyoei Fire & Marine Ins. Co., Ltd. v. M/V Maritime Antalya,* 248 F.R.D. 126, 152 (S.D.N.Y.2007) (same); *Poole ex rel. Elliott v. Textron, Inc.,* 192 F.R.D. 494, 504 (D.Md.2000) (same); *Dravo Corp. v. Liberty Mut. Ins. Co.,* 164 F.R.D. 70, 75 (D.Neb.1995) (same); *Rainey v. Am. Forest and Paper Ass'n, Inc.,* 26 F.Supp.2d 82, 94–95 (D.D.C.1998) (same); *Nev. Power Co. v. Monsanto Co.,* 891 F.Supp. 1406, 1418 (D.Nev.1995) ('a[n agency] must prepare them to give complete, knowledgeable and binding answers' (quotation marks and citations omitted[in orig.])); *Marker v. Union Fidelity Life Ins. Co.,* 125 F.R.D. 121, 126 (M.D.N.C.1989) ('give complete, knowledgeable and binding answers'); *Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.,* 441 F.Supp.2d 695, 723 (M.D.Pa.2006) ('designee does not merely speak for his own personal knowledge, but is "speaking for the corporation." ... [I]t cannot present "a theory of facts that differs from that articulated by the designated representatives." ' (citations omitted [in orig.])).").

Logistics, formerly Con-way Truckload," actually "Con-way Truckload Inc." (*Id.* at 12:10-11, 17-25).[9] Con-way was bought out by XPO Logistics "recently," (*Id.* at 13:7-13). Her present position is as a safety analyst, (*Id.* at 13:15), and she had the same job during her dealings with Mr. Harmanson, (*Id.* at 13:20). She has worked for Con-way for a total of seven years, the last five in her current position, (*Id.* at 13:23-14:1). The resolution of Mr. Harmanson's property damage claim arising from the September 19, 2014, collision with Ryan's truck occurred between the date of collision and about "November or so of 2014," (*Id.* at 14:11-23). She worked in the risk management department of Con-way Truckload Inc., (*Id.* at 15:20-24). Six to seven people were in that department, several being safety analysts like her, (*Id.* at 16:8-13). In the 2014 period, she handled personal injury and property damage claims, but not death claims, (*Id.* at 17:18-23; 18:3-12). In her file notes, any entry made by her was followed with "//SH," (*Id.* at 26:8-11). The documents she produced at her deposition are true, correct and complete copies of her file regarding Mr. Harmanson, (*Id.* at 27:8-28:7).[10] The Full and Absolute Property Damage Release, (Motion Ex. I), is a Con-way document which

---

[9] In its First Amended Answer filed herein, (Doc. 15), Defendant Con-way answers under that corporate name, making no mention whatever of "XPO Logistics." And throughout discovery herein, Con-way and its employee Ryan have used that name. Since *Erie* controls the substantive law of this case, "Texas law… mandates that a defendant must raise misidentification as a verified denial in its answer. *CHCA E. Houston, L.P. v. Henderson,* 99 S.W.3d 630, 633 (Tex.App.- Houston [14th Dist.] 2003, no pet.)." *Ultraflo Corp. v. Pelican Tank Parts, Inc.,* 926 F. Supp. 2d 935, 952 (S.D. Tex. 2013). Consequently, it is the duty of Con-way to clarify whether or not it is a proper party-defendant before this court. Alternatively, "[U]nder Texas law, when a defendant is misnamed in a suit, but is served with the misnomer and involved in the suit, the court acquires jurisdiction over the misnamed party if it is clear that no one is prejudiced by the error." *Dalton v. State Farm Lloyd's, Inc.,* 4 F. Supp. 3d 859, 864 (S.D. Tex. 2014).

[10] This is relevant to the instant analysis because it verifies the source and authenticity of the Motion Exhibits obtained from Con-way during discovery herein.

is printed out. It relates to property damage settlements, (*Id.* at 36:3-19). She filled it out "to some extent" and particularized it to relate to Mr. Harmanson, (*Id.* at 37: 11-23).

17.     Mr. Harmanson made a property damage claim regarding the collision at issue and Hambright handled that claim for Con-way, (*Id.* at 44:2-7). Hambright has "some college education," (*Id.* at 47:22), and a "real estate license, which doesn't have much to do with this," (*Id.* at 47:24-25); but, she has never worked for an insurance company, (*Id.* at 48:5-6), and "was not sent out for any training," (*Id.* at 48:16). She was not licensed to handle claims, (*Id.* at 48:24). She was not authorized to handle personal injury claims up to $100,000, or even up to $50,000, (*Id.* at 49:25-50:5). Neither was she authorized to settle property damage claims up to any determined level, (*Id.* at 50:14-20). Basically, any settlement she made had to be approved by a supervisor, (*Id.* at 52:12-13). She couldn't settle a $10,000 property damage claim without approval, (*Id.* at 54:1-10). But she could settle a claim of $1,544.74, such as Mr. Harmanson's, (*Id.* at 54:14-20). She never had a specific meeting to discuss Mr. Harmanson's property damage claim with a supervisor, (*Id.* at 60:24-25). Only the risk management department at Con-way had the authority to settle these sorts of claims, (*Id.* at 61:19-62:17).

18.     Hambright personally discussed the collision with Con-way's driver (Defendant) Phillip Ryan, (*Id.* at 63:25-64:4). This was summarized in her notes, (*Id.* at 65:7-10. 14-15). Con-way hired Crawford & Co. as an independent adjuster, (*Id.* at 67:4-8). In fact, Hambright personally hired Crawford, (*Id.* at 67:13-15). Crawford was hired to "go out and do their independent estimate on the [Harmanson] vehicle," by doing "an appraisal from their standpoint and report it to her," (*Id.* at 67:16-25). It was done and

she received it, (*Id.* at  68:3-4). According to the appraisal, (Con-way 000003), the damage to Mr. Harmanson's vehicle "was $1,544.74," (*Id.* at  69:17-25). In her notes she confirmed that she entered: "10-13 of 2014 at 1:58 I received the IA, which is independent adjuster's report, on PD from Maria Morales and scanned to knowledge link, attached three-day repair appraisal to the claimant's car of $1,544.74." (*Id.* at  72: 9-13). The adjuster's report came from Crawford & Co., (*Id.* at  73:22-24). Con-way Truckload paid Crawford & Co., (*Id.* at  74:19-20). Mr. Harmanson had no say in that arrangement, (*Id.* at  75:13-17). She discussed the IA with Crawford's Maria on October 14th, (*Id.* at  77:8-10), and then that same day, she offered to settle with Mr. Harmanson for $1,544.74, (*Id.* at  78:2-7). This was her final offer of settlement of Mr. Harmanson's ***property damage claim.*** (*Id.* at  78:17-25) (emphasis added). ***She explicitly reiterated that: she offered $1,544.74 to settle Mr. Harmanson's property damage claim, he wanted the check made out to him, and after "his attorney told him to," he agreed to settle his property damage claim in that amount*** (*Id.* at 79:14-21) (emphasis added).

19.     Hambright was evasive as to whether "the $1,544.74 was not a settlement of his bodily injury claim," by asserting "I really can't answer that honestly," (*Id.* at  80:19-21); yet, she affirmed that the $1,544.74 was a "settlement of his property damage claim," (*Id.* at  80:14-16), "to get his vehicle fixed," (*Id.* at  80:22-24). She further admitted that she "offer[ed] $1,544.74 in settlement of his property damage claim," and it clearly states the same in her contemporaneously prepared file notes, (*Id.* at  80:22-81:6). Indeed, she agreed that the memo she wrote says nothing about a bodily injury claim, (*Id.* at  81:11-13). In fact, she agreed that in her notes, "you will also see there's no

other mention of bodily injury or that he was treating at the time. So I had no idea what was going on with him... there's no mention of injury or what we're treating for," (*Id.* at 81:14-21). Of critical importance to the instant analysis is that Hambright expressly conceded that she and Mr. Harmanson "were not discussing bodily injury at the time," (*Id.* at 82:16). Indeed, "there was no discussion going on at all about his bodily injury claim at that time," (*Id.* at 82:23-25). She was asked: "And the intent of the $1,544.74 offer was to settle his property damage claim?" And, she answered, "Yes. It was a property damage settlement, yes." (*Id.* at 83:1-3). Incredibly, Hambright tried to assert that she couldn't say it was "only" a property damage settlement, even though she readily agreed once again that Mr. Harmanson "agreed to a property damage settlement in the amount of $1,544.74, (*Id.* at 83:7-14). Hambright conceded that she knew Mr. Harmanson was also asserting a bodily injury claim in addition to his property damage claim and they were separate and apart from each other, (*Id.* at 83:15-21; 84:4-18). In fact, "[t]hat's usually how it happens," (*Id.* at 84:19-24). This is because property damage claims are "easier to quantify," (*Id.* at 85:8-10), whereas bodily injury claims can "take a long time to figure out," (*Id.* at 85:1-7). Hambright went on to expressly agree that her intent was to settle Mr. Harmanson's property damage claim and leave open the bodily injury claim for further resolution on the merits "with proper documentation of the extent, duration of the bodily injury claim," (*Id.* at 85:11-20). Regarding the check she sent him, she was "satisfied he knew that that was for property damage only," (*Id.* at 86:17-19). She "made it clear that it was property damage". (*Id.* at 86:25-87:2).

Page 22

20.     Hambright acknowledged that per her notes of October 15, 2014, Mr. Harmanson was represented by a lawyer, who had no interest or role in the property damage claim, (*Id.* at 87:12-17). Critically importantly to the instant analysis, Hambright further confirmed she made the "final offer on the property damage" in the amount of $1,544.74, (*Id.* at 88:16-25), and her note entry of October 16, 2014, confirms that: "***I received the signed release for property damage in the amount of the $1,544.74 from the claimant, Mr. Harmanson.***" (*Id.* at 89:10-12)(Emphasis added). However, Hambright conceded the release was not signed by Mr. Harmanson, (*Id.* at 90:21-23; 91:4), but even so, she authorized the issuance of the settlement check, (*Id.* at 90:1-3; 93:24-94:1; 94:20-21). She agreed that the "Full and Absolute Property Damage Release" released the property damage only, (*Id.* at 94:1-7). The release does not "release the bodily injury claim or purport to even – purport to release the bodily injury claim," (*Id.* at 94:8-13). However, when the check was prepared, on its reverse side was an endorsement stamp below the signature space, (*Id.* at 95:11-16), which was physically placed there by Hambright or fellow employee Dan Fowler, (*Id.* at 96:12-97:3). The stamp is a general release stamp, not a property damage claim release stamp, (*Id.* at 97:17-19), which Hambright acknowledged is "a release of all claims and every claim as well." (*Id.* at 97:19-21). Yet she asserts there is no problem with that even though the check was issued intending "to settle the property damage claim only," (*Id.* at 98:23-99:2), and the stamped release is not limited to such a settlement, (*Id.* at 99:3-7). When pressed, Hambright conceded that it was her idea to put the general release stamp on the check, (*Id.* at 99:16-17), having discussed it with Dan Fowler before she did it, (*Id.* at 99:21-22). She admitted that she never discussed with Mr.

Page 23

Harmanson her intention to put a general release stamp on the reverse side of the check, (*Id.* at  99:23-100:2). But her boss, Fowler, agreed with doing it, (*Id.* at  104:2-7). The check was sent directly to Mr. Harmanson, (*Id.* at   105:11-13; 106:4-8), with no explanatory letter, email or other correspondence, (*Id.* at 104:11-12).  Hambright did not tell Mr. Harmanson she had put a general release stamp on the check, neither in writing nor orally. (*Id.* at   106:9-16). Moreover, Ryan, as a driver, had no authority to offer settlements to anybody, as it is against company policy, (*Id.* at  110:23-111:4; 111:23-112:3; 112:6-14;  114:17-20). In fact, Ryan was fired for doing just that, (*Id.* at  112:15-21). He was also fired for trying to hide the incident from the company, (*Id.* at  113:3-16).

21.     Regarding the unsigned Full and Absolute Property Damage Release, Hambright conceded that it was limited by its own emboldened language to a property damage release, (*Id.* at  115:24-116:18). Additionally, Hambright conceded that the bodily injury claim was not closed down after he negotiated the check, (*Id.* at  118:7-9). The bodily injury claim remained open, (*Id.* at  118:20-22; 119:1). Crawford & Co. closed their file because they were only involved in adjusting the $1,544.74 property damage claim, (*Id.* at  128:8-10; 128:23-129:6). Therefore, when Hambright's testimony is considered in context, it is, respectfully, surreal for her to persist in contending that the settlement and check issued to Mr. Harmanson had anything whatsoever to do with his bodily injury claim.

# IV.
## ANALYSIS, ARGUMENT AND AUTHORITIES

### A.  *Partial Summary Judgment is Permissible Pursuant to F.R.C.P. 56(a).*

22.    Fed. R. Civ. P. 56(a) provides that "A party may move for summary judgment, identifying… the part of each claim… on which summary judgment is sought." (*Id.*). As succinctly explained, in light of the 2010 amendment of Fed. R. Civ. P. 56(a), in *Davis v. Union Pac. R.R. Co.,* No. 5:12-CV-2738, 2014 WL 3499228, at *4 (W.D. La. July 14, 2014)(Stagg, J.):

> Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

>> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

> Fed. R. Civ. P. 56(a). "A partial summary judgment order ... is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." *F.D.I.C. v. Massingill,* 24 F.3d 768, 774 (5th Cir.1994). Partial summary judgment serves the purposes of narrowing, simplifying, and focusing the issues for trial. *See Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1415 (5th Cir.1993). "Rule 56 [(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Patrick v. Ridge,* 394 F.3d 311, 315 (5th Cir.2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." *Gen. Universal Sys., Inc. v. Lee,* 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. *See Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir.2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the

nonmovant's burden in a motion for summary judgment. *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir.2002).

*Davis,* at 2014 WL 3499228, *4. *See also Norton v. Assisted Living Concepts, Inc.,* 786 F. Supp. 2d 1173, 1187 (E.D. Tex. 2011)("Rule 56 was amended effective December 1, 2010, and whereas former Rule 56(a) simply read that '[a] party claiming relief may move ... for summary judgment on all or part of the claim,' it now expressly recognizes that '[a] party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought.' (emphasis added [in orig.]). The Advisory Committee Note explaining this change states that it was 'added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also to a claim, defense, or part of a claim or defense.' In accordance with this change, district courts have begun to recognize motions for summary judgment that are directed towards matters of law that are less than all of a particular claim. *See, e.g., Isovolta Inc. v. ProTrans Int'l, Inc.,* No. 1:08–cv–1319–JMS–DML, 2011 WL 221886, at *2 (S.D. Ind. Jan. 19, 2011). Accordingly, the court finds that Norton's request [for summary disposition of certain claims only] is cognizable."); *L.C. Eldridge Sales Co. v. Azen Mfg. Pte., Ltd.,* No. 6:11CV599, 2013 WL 7964028, at *1, (not reported in F.Supp.2d), (E.D. Tex. Nov. 14, 2013)('[S]ummary judgments directed to less than all of a particular claim are appropriate."); and, *U.S. ex rel. King v. Solvay S.A.,* 304 F.R.D. 507, 510 (S.D. Tex. 2015)(Miller, J.)("[C]ourts allow partial summary judgment, as it 'enable[s] the district court to enter an order indicating that the defense in no longer in controversy' and is not limited to the pleadings like a motion to strike. 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1381 (3d ed. 2004); 10B Charles Alan Wright et al., *supra,* §

2737."). Thus, what Mr. Harmanson properly seeks is this Court's summary judgment solely regarding the preserved affirmative defenses of accord and satisfaction and waiver and acquiescence asserted by the Defendants, leaving only the issues of Mr. Harmanson's unliquidated damages for jury trial on their merits.[11]

23.    Moreover, numerous cases "have allowed the utilization of summary judgment to dispose of affirmative defenses." *Koch Indus., Inc. v. United Gas Pipe Line Co.,* 700 F. Supp. 865, 867 (M.D. La. 1988) (citing *Leasing Serv. Corp. v. Graham,* 646 F.Supp. 1410, 1414–15 (S.D.N.Y.1986)); *First Nat'l City Bank v. Kline,* 439 F.Supp. 726, 728 (S.D.N.Y.1977); *Krauss v. Keibler–Thompson Corp.,* 72 F.R.D. 615, 616 n. 7 (D.Del.1976); *Looney v. Great Am. Ins. Co.,* 71 F.R.D. 211, 212 n. 2 (E.D.N.Y. 1976). *See also* Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2737." *Id.* at 867, n. 8. *See also Fed. Sav. & Loan Ins. Corp. v. Shelton,* 789 F. Supp. 1367, 1368-69 (M.D. La. 1992)("[T]his Court has sanctioned the use of summary judgment to dispose of affirmative defenses [citing *Koch Indus.*]. Therefore, the Court finds that plaintiff's motion for partial summary judgment on defendants' affirmative defenses was timely and procedurally proper."); and, E.E.O.C. v. I-Sector Corp., No. 3:01-CV-2240-R, 2003 WL 29939, at *2, (not reported in F.Supp.2d), (N.D. Tex. Jan. 2, 2003)("Partial summary judgment can be used to 'dispose of affirmative defenses.' *Koch Industries v. United Gas Pipe Line Co.,* 700 F.Supp. 865, 867 (M.D.La.1988).").

---

[11] *See Nagle v. Gusman,* 61 F. Supp. 3d 609 (E.D. La. 2014)(court granted summary judgment of some of plaintiff's claims, leaving others for resolution at trial).

24.     Also, to avoid any contention that the instant MPSJ is, in reality an untimely Rule 12(f) motion to strike, the Court should note that in *Resolution Trust Corp. v. Vestal,* 838 F. Supp. 305, 307 (E.D. Tex. 1993)(Cobb, J.), the court made clear that: "Although the RTC's motion is untimely as to Rule 12(f), it finds new life under Rule 56. That rule permits the entry of partial summary judgment where no issue of material fact exists and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Oregon Laborers–Employers Trust Funds v. Pacific Fence and Wire Co.,* 726 F.Supp. 786, 788 (D.Ore.1989) (party has the right to challenge the legal sufficiency of a defense at any time). Since the court finds that partial summary judgment is appropriate in this case, it will accept the RTC's motion." *Id.* at 307.

   **B.** ***Summary Judgment Standard.***

25.     In *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir. 1998), the 5th Circuit explained that:

> A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). Once a movant… makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted. *Id.* at 321–25. A party opposing such a summary judgment motion may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–57 (1986). Summary judgment is not a "disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327. When ruling on a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold,* 369 U.S. 654, 655 (1962)); *Hansen v. Continental Insur. Co.,* 940 F.2d 971, 975 (5th Cir.1991).

> The party opposing summary judgment is required to identify specific
> evidence in the record and to articulate the precise manner in which that
> evidence supports his or her claim. *See Forsyth v. Barr,* 19 F.3d 1527,
> 1537 (5th Cir.), *cert. denied,* 513 U.S. 871 (1994). "Rule 56 does not
> impose upon the district court a duty to sift through the record in search
> of evidence to support a party's opposition to summary judgment." *Skotak
> v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert.
> denied,* 506 U.S. 832 (1992).

*Ragas,* at 458. *See also Willis v. Cleco Corp.,* 749 F.3d 314, 317 (5th Cir. 2014)("A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and a fact is material if it 'might affect the outcome of the suit.' *Id...* To satisfy its burden, the party opposing summary judgment is 'required to identify specific evidence in the record, and to articulate the "precise manner" in which that evidence support[s] their claim.' *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.1994). This court has regularly reminded litigants that 'Rule 56 does not impose upon the district court [or the court of appeals] a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998)."); and, *Joe Hand Promotions, Inc. v. 152 Bronx, L.P.,* 11 F.Supp.3d 747, 751-52 (S.D. Tex. Mar. 26, 2014)("The Fifth Circuit requires the nonmovant to submit 'significant probative evidence.' *Id.,* quoting *In re Municipal Bond Reporting Antitrust Litig.,* 672 F.2d 436, 440 (5th Cir.1982), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-op.,* 799 F.2d 194, 197 (5th Cir.1986). 'If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.' *Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644 (5th Cir.1999), *citing Celotex,* 477 U.S. at 322, and *Liberty Lobby,* 477 U.S. at 249-50.").

26.    And, in *U.S. ex rel. King,* 304 F.R.D. at 510, discussed *supra,* the court noted that:

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 411 (5th Cir.2007). "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.,* 463 F.3d 388, 392 (5th Cir.2006)… To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial'." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e))… the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.,* 276 F.3d 754, 759 (5th Cir.2002); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

*U.S. ex rel. King,* at 510. As will be explained in detail *infra,* the application of this analytical rubric as well as the controlling substantive Texas affirmative defenses law, to the instant facts should overwhelmingly demonstrate to this Court that the partial summary judgments against the Motion Defendants here sought by Mr. Harmanson is entirely factually justified and legally and procedurally appropriate.

## C. *Controlling Texas Affirmative Defenses Law.*

### 1. **Affirmative defenses are based in Texas state law.**

27.    This entire MPSJ might seem like a "tempest in a teapot," as Defendants have expressly stipulated to negligence liability, (Motion Ex. A). However, it most certainly is not because in Defendants' Stipulation of Liability, the affirmative defenses here at issue are preserved. Thus, the validity of such affirmative defenses must be resolved in order to

avoid a trial of liability issues arising therefrom. In Con-way's First Amended Answer and Affirmative Defenses, (Doc. 15), and Ryan's Answer and Affirmative Defenses, (Doc. 16), each Defendant has asserted the identical affirmative defenses of "accord and satisfaction," ("Affirmative Defenses section, ¶ 2), and "waiver and acquiescence," (*Id.* at ¶ 3). Pursuant to Fed. R. Civ. P. 8(c)(1), the affirmative defenses of "accord and satisfaction" and "waiver" must be "affirmatively stated," (*Id.*), which they are. Rule 8 contains no reference to an affirmative defense of "acquiescence," (*Id.*); however, arguably, the rule's reference to "any… affirmative defense" is broad enough to cover it, (*Id.*).[12] However, while procedurally properly here pleaded, pursuant to *Erie,* each such affirmative defense is substantively determined according to Texas state law. *See Seal v. Indus. Elec., Inc.,* 362 F.2d 788, 789 (5th Cir. 1966)("A removed case proceeds according to Federal procedural rules as though it had originally been commenced in the Federal court. Wright, Federal Courts 125 § 40. Affirmative defenses must be affirmatively pleaded. Rule 8(c) Fed. Rules Civ. Proc. 28 U.S.C.A… Whether a particular matter is to be regarded as an affirmative defense is to be determined by state law. 1A Barron & Holtzoff (Wright ed.) § 279."). Moreover, "When a defendant pleads the affirmative defense of accord and satisfaction, it assumes the burden of establishing that defense," *Nemitz v. Norfolk & W. Ry. Co.,* 15 Ohio Misc. 317 (N.D. Ohio 1968) *aff'd,* 404 U.S. 37 (1971).

---

[12] *See In re Sterten,* 546 F.3d 278, 285 (3d Cir. 2008)(" '[T]he purpose of requiring the defendant to plead available affirmative defenses in his answer is to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.' *Robinson v. Johnson,* 313 F.3d 128, 134-35 (3d Cir.2002)"). Tex. R. Civ. P. 94 is very similarly structured, having no reference to "acquiescence," but also permitting the pleading of "any other matter constituting an… affirmative defense." (*Id.*).

*2.*    **Requirements for "accord and satisfaction," pursuant to Texas state law.**

28.    In *Baeza v. Hector's Tire & Wrecker Serv., Inc.,* 471 S.W.3d 585, 592 (Tex.App.- El Paso 2015, no pet.), the CCA explained:

> The common law defense of "accord and satisfaction" rests upon a new contract, express or implied, in which the parties agreed to the discharge of an existing obligation by means of a lesser payment tendered and accepted. *See Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 863 (Tex.2000); *Melendez v. Padilla,* 304 S.W.3d 850, 852 (Tex.App.– El Paso 2010, no pet.). The term "accord" refers to the new agreement in which one party agreed to give or perform and the other to accept "something other than or different from what she is, or considers herself to be, entitled to." *Melendez,* 304 S.W.3d at 852–53. The term "satisfaction" refers to the actual performance of the new agreement, in which the party accepts the tendering of the lesser payment. *Id.*
>
> To prevail under the common law theory of accord and satisfaction, the moving party is required first to establish the existence of a dispute between the parties. *Id.* at 853. It is the very existence of a dispute that provides the consideration for the parties' new contract and for the accord and satisfaction itself. *Milton M. Cooke Co. v. First Bank & Trust,* 290 S.W.3d 297, 304 (Tex.App.–Houston [1st Dist.] 2009, no pet.). If a pre-existing dispute is established, the moving party must then establish that the parties "specifically and intentionally agreed" that the tendering and acceptance of the reduced sum would discharge the underlying obligation that formed the basis of their dispute. *Melendez,* 304 S.W.3d at 853; *Milton M. Cooke Co.,* 290 S.W.3d at 304. Further, the moving party must establish that he tendered the reduced sum to the nonmoving party with an "unmistakable communication" to the nonmoving party that the tender of the reduced sum was upon the condition that acceptance would satisfy the underlying obligation. *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex.1969); *Richardson v. Allstate Texas Lloyd's,* 235 S.W.3d 863, 865 (Tex.App.– Dallas 2007, no pet.).

*Baeza,* at 592. It should be manifestly evident from a careful reading of Hambright's deposition that none of the requisites for the application of an "accord and satisfaction" affirmative defense are present in this case. Indeed, the exact opposite occurred here. Hambright, the only Con-way employee to have direct contact with and negotiations with Mr. Harmanson, made the decision early on that he was "attempting to inflate his PD" and

that his claim "IS A TOTAL SCAM (emphasis in Hambright's original notes)." Therefore, when Hambright and he arrived at the agreement to resolve his property damage claim only - in the amount of $1,544.74 - she discussed the matter with her boss and decided to pull a fast one, stamping a general release on the check under the endorsement space of the check's reverse side. There was no agreement to this general release; Hambright transmitted the check with no oral or written disclosure of her surreptitious intention, and Hambright expressly conceded under oath that Mr. Harmanson had no idea that the check constituted a general release, as evidenced by Hambright's own admission that his bodily injury claim continued and that the file pertaining to him was not closed. In fact, given the specificity of her testimony, on numerous occasions, that the check was only and exclusively intended to resolve Mr. Harmanson's property damage claim, it defies logic and reason for Con-way to seriously assert such an affirmative defense or to persist in contending the validity of an obviously perfidious "general release" which was never the agreement between the Parties.[13]

29.     Similarly, in *Katy Int'l, Inc. v. Jinchun Jiang,* 451 S.W.3d 74, 86 (Tex.App.- Houston [14th Dist.] 2014, reh'g overruled, rev. denied, reh'g of pet. for rev. denied), the CCA observed that: "The defense of accord and satisfaction rests on a contract in which the parties agree to the discharge of an existing obligation by means of a subsequent payment

---

[13] *Baeza* also discusses the availability of such an affirmative defense statutorily, pursuant to Tex. Bus. & Com. Code § 3.311 (West 2002). However, such a defense is *per se* unavailable to Con-way in the instant circumstance inasmuch as: "In particular, the Code provides that a person may discharge a debt when: (1) *that person in good faith tendered an instrument to the claimant as full satisfaction of the claim;* (2) the amount of the claim was unliquidated or subject to a bona fide dispute; and (3) the claimant obtained payment of the instrument. (Emphasis added)." *Id.,* at 593-94; and, it is absolutely clear that Hambright did not stamp the back side of the check with a general release in good faith. Indeed, her specific intention was deceitful.

tendered and accepted. *Huang v. Don McGill Toyota, Inc.,* 209 S.W.3d 674, 681 (Tex.App.-Houston [14th Dist.] 2006, no pet.). ***For the accord and satisfaction defense to prevail, there must be evidence that there was a dispute between the parties and they specifically and intentionally agreed to discharge the party's obligations.*** *Id.*; *see also Custom Transit, L.P. v. Flatrolled Steel, Inc.,* 375 S.W.3d 337, 347 (Tex.App.- Houston [14th Dist.] 2012, pet. denied) ***("[F]or this defense to prevail, there must be a dispute and an unmistakable communication to the creditor that tender of the reduced sum is upon the condition that acceptance will satisfy the underlying obligation."*** (alteration in original, citation omitted [in orig.])). (Emphasis added)." *Id.* at 86. Con-way knows full well that no such agreement to a general release was ever discussed, agreed to or contemplated between Hambright and Mr. Harmanson. Mr. Harmanson accepted the check in contemplation of the settlement of his property damage claim only and Hambright intentionally attempted to deceive him.

### 3.    "Waiver and acquiescence" are wholly irrelevant to the instant analysis.

30.    Respectfully, Mr. Harmanson is "swatting at ghosts" in his rebuttal of any alleged "waiver and acquiescence" affirmative defense because nowhere in the Defendants' responsive pleadings, nor in any discovery responses have they ever explained the factual or legal basis for such a defense. This is important because, as discussed *supra,* the burden of proving an affirmative defense rests with the Defendants. In the instant circumstances, that appears to be a legal impossibility because, as defined by controlling Texas substantive law, "waiver and acquiescence" have nothing to do with this case, instead applying to real property disputes. In *Lee v. Powers,* 446 S.W.2d 938, 939 (Tex. Civ. App.- Houston [14th Dist.] 1969, no writ), the CCA dealt with an "action to enforce by

injunction certain restrictive deed covenants," *Id.* at 938. In relevant part, the CCA explained the affirmative defense now asserted by Defendants is a part of the defense of "latches, acquiescence and waiver," *Id.* at 939. The CCA further noted: "The burden of establishing the defense of laches was upon the defendant. He had the burden to evidence acquiescence in prior violations of other individuals if reliance was to be placed thereon. *Allen v. Winner,* Tex.Civ.App., 389 S.W.2d 599, ref., n.r.e. As indicated, acquiescence in prior violations of others has not been shown so as to sustain the defensive plea of waiver. *Allen v. Winner, supra; Stewart v. Welsh,* 142 Tex. 314, 178 S.W.2d 506 (1944); *Cowling v. Colligan,* 158 Tex. 458, 312 S.W.2d 943 (1958)." *Id.*

31.    Defendants bear the burden of proof on all elements of their waiver-based affirmative defenses. *Chrysler-Plymouth City. Inc. v. Guerrero*, 620 S.W.2d 700, 706 (Tex. Civ. App.-- San Antonio, no writ) (burden of proof lies on party asserting affirmative defense); *Melton v. Miller*, 391 S.W.2d 568, 571 (Tex. Civ. App.--Houston 1965, no writ) (affirming summary judgment against deed restrictions violator; burden of proving waiver lay with violator. who must present some evidence that *every plaintiff* waived enforcement rights). Defendants' two waiver defenses are essentially one and the same claim. "Waiver" is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *Unites States Fidelity & Guaranty Co. v. Bimco Iron & Metal Corp.*, 464 S.W.2d 353, 357 (Tex. 1971). *See also* Texas Pattern Jury Charges 101.24 (1998 ed.). To establish waiver in a deed restrictions case, "the nonconforming user must prove that violations then existing are so great as to lead the mind of the 'average man' to reasonably conclude that the restriction in question has been abandoned and its enforcement waived." *Finkelstein v. Southampton Civic Club*, 675 S.W.2d 271, 278 (Tex. App.--Houston [1st Dist.]

1984, writ ref'd n.r.e.). Among the factors to be considered "are the number, nature, and severity of the then existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant." *Id*. *See also Finkelstein*, 675 S.W.2d at 278 (affirming summary judgment on non-conforming property owner's waiver and estoppel defenses where affidavit evidence proved up only two prior violations of corner lot fronting restriction at issue); *Zent v. Murrow*, 476 S.W.2d 875, 879-80 (Tex. Civ. App.--Austin 1972, no writ) (holding that plaintiffs' acquiescence in placing of duplex units on 6 lots, and church on 2 other lots, in 42-lot subdivision did not preclude them from enforcing single family residence restriction against neighbors' construction of duplexes on adjacent lots); *Cowling v. Culligan*, 312 S.W.2d 943, 945 (Tex. 1958) (reversing trial court's finding that plaintiffs had waived residential use only restriction by allowing church to be erected in subdivision). Mr. Harmanson readily agrees this analysis is far afield from the matters at issue in the instant analysis. But, respectfully, that is precisely the critical point - the affirmative defense of "waiver and acquiescence," a real estate concept, has no factual or legal vitality in or relevance to this case whatsoever, and therefore, as a matter of law, Defendants cannot adduce *any* evidence that raises a material issue of fact with respect to their affirmative defenses based upon waiver.

32.   In consequence of the foregoing analysis, Mr. Harmanson is entitled to partial summary judgment as regards Defendants' proffered affirmative defenses of "accord and satisfaction" and "waiver and acquiescence," as a matter of law.

<u>CONCLUSION</u>

For each and all of the foregoing reasons, and based upon the overwhelming evidentiary support therefore and the controlling Texas affirmative defense law herein

explained in detail, Mr. Harmanson respectfully moves this Court to grant him partial summary judgment in his favor against Defendants Con-way and Ryan, as pertains to the preserved affirmative defenses of accord and satisfaction and waiver and acquiescence, leaving for the scheduled jury trial only the resolution of issues of proximately caused damages arising from the Defendants' negligence and stipulated liability.

Respectfully submitted,
LAW OFFICES OF GENE S. HAGOOD
1520 E. Highway 6
Alvin, Texas 77511
(281)331-5757
Fax: (281)331-1105
e-mail: firm@h-nlaw.com

BY: _____/s/ Gene S. Hagood_____
GENE S. HAGOOD
SBOT# 08698400, FBA #3475
Attorneys for Plaintiff

## CERTIFICATION OF OPPOSITION

Counsel for Defendants has notified Plaintiff of their opposition to the relief sought herein.

_____/s/ Gene S. Hagood_____
Gene S. Hagood

CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. Proc., Rule 5, I certify that on this the 7th day of March, 2016, a true and correct copy of the foregoing Opposed Motion for Partial Summary Judgment was forwarded to all counsel of record, by forwarding same by fascimile and/or electronic transmission as follows:

Mr. Eric R. Benton and Ms. Katie Sunstrom, Lorance & Thompson, PC, 2900 North Loop West, Suite 500, Houston, TX 77092


_____ /s/ Gene S. Hagood _____
Gene S. Hagood